AO 91 (Rev. 11/11) Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
04/11/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: AP   DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
04/14/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: DE   DEPUTY

United States of America )
v. )
JOSE EVODIO GARCIA )   Case No.  5:25-mj-00201
)
)
)
)
Defendant(s)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __April 9, 2025__ in the county of __Riverside__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm and Ammunition |

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

/s/ Harvey Nunez
*Complainant's signature*

Harvey Nunez, U.S. Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 04/11/2025

*Judge's signature*

City and state:

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Border Patrol Agent Harvey Nunez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint and arrest warrant against Jose Evodio GARCIA ("GARCIA") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition.

2.  This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A: Apple, iPhone, Silver, clear case.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition) (the "Subject Offense"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements

described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico, and have been employed as a full-time, sworn federal BPA with the USBP since August 8, 2007. I have received specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

## III. SUMMARY OF PROBABLE CAUSE

6.  GARCIA was driving on Interstate 10 ("I-10") when Border Patrol Agents from the Indio Station stopped his vehicle due to the combination of his erratic driving, the registered owner's previous arrest history, and the vehicle's international border crossing the day before. Upon searching the vehicle, agents recovered a semi-automatic machine gun, machine gun links which hold machine gun ammunition together, a 200-round capacity ammunition box, a Glock Gen 5 pistol, five fifteen-round Glock magazines, and approximately 4,990 rounds of .223 ammunition. Agents arrested GARCIA and then recovered the SUBJECT DEVICE which was in his hands. During a Mirandized interview, GARCIA told law enforcement he had agreed to transport the firearms and ammunition from Arizona to California in exchange for $1,000.

## IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. I-10 is Frequently Used by Alien and Drug Smugglers

8. USBP commonly patrols I-10 as it is frequently utilized by criminals trafficking contraband due to the highway's proximity to the U.S./Mexico international border fence and its western termination point in the greater Los Angeles area. Los Angeles is a source city for contraband and for illegal aliens entering the United States through ports of entry in Arizona and Southern California.

### B. Border Patrol Agents Conduct a Traffic Stop of GARCIA's Fiat

9. On April 9, 2025, Border Patrol Agents from the Indio Station ("Indio Agents") were assigned to work the I-10 corridor near Desert Center, California. Indio Agents were driving marked USBP service vehicles equipped with emergency lights and sirens.

10. At approximately 1:00 p.m., Supervisory Border Patrol Agent ("SBPA") Rubalcava was parked at the Cactus City Westbound I-10 Rest Area observing westbound traffic approximately 12.5 miles east of the Dillion Road exit. At approximately 1:20 p.m., SBPA Rubalcava observed a black 2014 Fiat sedan ("Fiat") bearing Arizona license plates pass in the number two lane behind several semi-tractors traveling slower than the commuting public. As SBPA Rubalcava began to merge onto I-10 westbound lanes, SBPA Rubalcava observed the Fiat accelerate and immediately merge into the number

one lane creating a greater distance between the Fiat and his marked vehicle. By the time SBPA Rubalcava merged onto I-10, the Fiat had positioned itself approximately ten vehicles from his marked vehicle. At that time, that area of I-10 was under construction and had heavy traffic, which made it difficult for SBPA Rubalcava to immediately catch up to the Fiat. As SBPA Rubalcava made his way through traffic, he saw the Fiat merge in and out of traffic, in what SBPA Rubalcava viewed as an attempt to use the traffic to distance the Fiat from his marked vehicle.

11. As SBPA Rubalcava caught up to the Fiat, SBPA Rubalcava saw the Fiat decrease speed and merge back into the number two lane, where it started traveling much slower behind a group of semi-tractors. Based on his training and experience, SBPA Rubalcava viewed the Fiats' driving tactics as an attempt to evade detection from law enforcement. In SBPA Rubalcava's experience conducting interdiction operations on Interstate Highways, speeding up to create distance, then slowing down and merging into slower traffic is a technique illicit cargo smugglers utilize to first try to create distance and then slowdown in an attempt to verify if law enforcement continues past their location. If law enforcement does not pass, but continues to follow, the illicit cargo smuggler is able to confirm if they have caught the attention of law enforcement.

12. SBPA Rubalcava slowed and merged into the number two lane behind the Fiat. SBPA Rubalcava then requested a vehicle check on the Fiat, and through use of law enforcement resources, learned that the Fiat was registered to GARCIA. Through the

vehicle check, SBPA Rubalcava also learned that GARCIA crossed the border in the Fiat at San Ysidro Port of Entry the day before, on April 8, 2025, at approximately 1:25 a.m.

13. Indio BPAs conducted additional record checks on GARCIA, using various Custom and Border Protection ("CBP") databases, which revealed that GARCIA had previously been arrested by USBP in May 2021 for Alien Smuggling, and also that he was previously investigated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in Phoenix for firearms violations.

14. SBPA Rubalcava merged into the number one lane and was able to travel alongside the Fiat. SBPA Rubalcava observed the driver was an older Hispanic male with short hair, and gray haired goatee, which matched the description of GARCIA in law enforcement databases.

15. SBPA Rubalcava slowed down to allow the Fiat to pull in front of his marked vehicle, and proceeded to follow the Fiat for several more miles. As SBPA Rubalcava traveled behind the Fiat, the Fiat accelerated and began weaving in and out of traffic once again. SBPA Rubalcava observed GARCIA trying to keep eyes on SBPA Rubalcava and his marked vehicle. SBPA Rubalcava observed GARCIA frantically turning his head to the rear of the vehicle and then back to the front continuously looking back at the side and rearview mirrors, which in turn cased GARCIA not to be able to maintain his lane of traffic. SBPA Rubalcava observed several times the Fiat was driving in two lanes at the same time for long periods of time. Based on SBPA Rubalcava's training and

experience, SBPA Rubalcava understood this type of erratic driving behavior is consistent with that of illicit cargo smugglers.

16. SBPA Rubalcava observed the Fiat for approximately 12 miles. Based on his erratic driving, the registered owner's previous arrest history, the vehicle's international border crossing the day before, and SBPA's Rubalcava training and experience, SBPA Rubalcava activated his emergency lights and initiated a vehicle stop approximately a quarter mile east of the Dillon Road exit, near Indio, California. The Fiat came to a complete stop.

    **C.    Border Patrol Agents See Firearm and Ammunition Under the Fiat during the Traffic Stop.**

17. At approximately 1:27 p.m., SBPA Rubalcava and his partner BPA Naoufal approached the Fiat. SBPA Rubalcava identified himself as a BPA and greeted GARCIA. SBPA Rubalcava then requested an identification from GARCIA, and GARCIA handed him an Arizona Vehicle Registration card, a printed Geico Insurance Company card, a La Paz County Sheriff's Office Warning / Equipment Repair Order dated April 09, 2025, and his United States Passport. SBPA Rubalcava then conducted a record check using GARCIA's name, date of birth and his passport number.

18. SBPA Rubalcava asked GARCIA about his travel itinerary. GARCIA stated that he was traveling from Phoenix, Arizona and traveling to Los Angeles, California for a doctor's appointment. SBPA Rubalcava questioned as to any recent travel to the US/Mexico border area. GARCIA stated that he recently visited

his wife in Tijuana, Mexico and had returned from Mexico the day before.

19.    SBPA Rubalcava also asked GARCIA about his criminal history, to which he replied that he had many prior arrests, including for alien smuggling about two years ago, but that he was not officially charged.

20.    At approximately 1:35 p.m., BPA Martinez and his canine partner Bak arrived at the scene of the traffic stop.

21.    SBPA Rubalcava asked GARCIA if there was anything inside the vehicle that a canine would alert to. GARCIA stated that there was not. SBPA Rubalcava requested that BPA Martinez and his canine partner conduct a non-intrusive canine sniff of the Fiat. SBPA Rubalcava also informed GARCIA that BPA Martinez and his canine partner would be conducting a sniff of the vehicle from the outside of the vehicle, and that he would be allowed to remain inside the vehicle during the exterior sniff.

22.    While conducting a non-intrusive sniff of the vehicle, canine Bak began to take deep and fast breaths as his ears pointed back as he approached the driver side window, which indicated to BPA Martinez that the canine was positively alerting. As BPA Martinez walked canine Bak towards the front of the vehicle, he continued to exhibit alert behavior.

23.    BPA Martinez informed GARCIA that the canine had alerted to his vehicle, and then walked back to his patrol vehicle to secure the canine. SBPA Rubalcava and BPA Naoufal then assisted GARCIA by collecting his wheelchair from the rear of the Fiat and placing him into the wheelchair. GARCIA was then

escorted to the rear of his vehicle near several of the marked vehicles off to the shoulder of the interstate in a safe area.

24. After GARCIA was out of the Fiat, BPA Martinez conducted a canine search of the vehicle. Canine Bak displayed the same alert behavior as they approached the passenger side door. While searching the suspected area of where the canine was alerting, BPA Martinez learned that other agents at the scene saw a rifle underneath the vehicle.

25. Underneath the vehicle, law enforcement recovered a black, military styled rifle secured with two metal hose clamps, along with a large Ziplock bag containing ammunition concealed within the rear bumper.

26. Law enforcement then placed GARCIA inside a marked Border Patrol unit and transported him to the Indio Border Patrol Station. During a search incident to arrest, law enforcement recovered the SUBJECT DEVICE from GARCIA's hands.

27. SBPA Rubalcava contacted radio dispatch to request that the Fiat be towed to the Indio Station for an inventory search.

**D. Inventory Search Revealed Additional Firearm and Ammunition Hidden Inside the Fiat.**

28. At the the Indio Station, law enforcement conducted an inventory search of the Fiat. After the search was completed, law enforcement recovered the following from the Fiat:

   a. 5.56mm FN M249S rifle with serial number M249SA09688, recovered from the undercarriage of the vehicle (the "Rifle");

      b.   9mm Glock model 19 Gen 5 pistol bearing serial number CAPC714, recovered between the roof and ceiling of the vehicle (the "Pistol");

      c.   Thirteen large Ziplock bags containing approximately 4,990 rounds of .223 ammunition, recovered from the rear bumper, underneath the rear seat, and inside a void behind the windshield wipers.



    **E.    GARCIA Admits to Trafficking Firearms and Ammunition from Arizona to California.**

    29.    On April 9, 2025, at approximately 2:12 p.m., at the Indio Border Patrol Station in Indio, California, law enforcement advised GARCIA of his *Miranda* rights in Spanish. GARCIA stated

that he understood his rights and was willing to answer questions without the presence of an attorney. The interview was recorded. In the interview, GARCIA stated, among other things:

    a.  On April 7, 2025, he crossed the San Ysidro port of entry after visiting his wife in Tijuana, Mexico for a couple of days and drove home to Avondale, AZ.

    b.  On April 8, 2025, he saw an advertisement on a Facebook Marketplace group for people who want to make money. He was desperate for money and responded to the advertisement.

    c.  An unknown Hispanic male contacted him and told him he needed someone to transport a rifle and ammunition to Compton, CA. He was to be paid $1,000.00 once he delivered them.

    d.  GARCIA agreed and was told to meet up in an alley in Phoenix, AZ off 35th Ave. and McDowell Rd.

    e.  Shortly after arriving to the location, a young Hispanic, stocky male in his thirties pulled in behind him. GARCIA stated he did not remember his name or what type of vehicle he was driving.

    f.  GARCIA stated he was instructed to drive home, park his vehicle and put the keys in the gas cap door.

    g.  The next morning, April 9, 2025, he received a message saying the vehicle was parked outside his apartment and he could leave whenever he's ready.

    h.  GARCIA stated he left his home in Avondale, AZ for Compton, CA around 11:00 a.m.

i. The SUBJECT DEVICE, which was in his hands at the time of his arrest, belonged to him.

**F.  GARCIA's Criminal History**

30. On April 10, 2025, I reviewed GARCIA's criminal history records and learned that GARCIA has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a. On or about May 26, 1994, a violation of California Health and Safety Code Section 11350(a), in the Superior Court for the State of California, County of Los Angeles, Case Number GA015862.

b. On or about July 6, 1993, burglary, in violation of California Penal Code 459, in the Superior Court for the in the Superior Court for the State of California, County of Los Angeles, Case Number GA015862.

**G.  Interstate Nexus**

31. On April 10, 2025, ATF Special Agent Paul Kirwan examined photographs of the Rifle and Pistol and confirmed that both of them were manufactured outside of the State of California.  Because the firearms were found in California, they must have traveled in and affected interstate commerce.

**V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

32. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they

or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.    As used herein, the term "digital device" includes the SUBJECT DEVICE.

34.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    35.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. <u>CONCLUSION</u>

36.   For all the reasons described above, there is probable cause to believe that GARCIA has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of April 2025.

_____
HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE